IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| ROBERT M. and DEBORAH M., on behalf of themselves and their minor child, JORDAN M., | ) ) ) | Civil No. 07-00432 HG-LEK (Other Civil Action) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| STATE OF HAWAII, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER AFFIRMING IN PART AND DENYING IN PART THE JULY 20, 2007
FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION OF THE
ADMINISTRATIVE HEARINGS OFFICER**

Plaintiffs Robert M. and Deborah M., individually and on behalf of their minor child, Jordan M., appeal from the July 20, 2007 Administrative Hearings Officer's Decision finding that the Defendant State of Hawaii provided Jordan M. with a free appropriate public education pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.; the Rehabilitation Act of 1973, Section 504, 29 U.S.C. § 794 ("Section 504"); and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq..

In their Complaint, Plaintiffs request a determination that the May 9, July 12, and December 8, 2005 Individualized Education Programs ("IEPs") failed to provide Jordan with a free

1

appropriate public education ("FAPE").  If, as Plaintiffs

contend, the administrative law judge erred in finding that

Jordan was provided a FAPE, Plaintiffs request reimbursement for

funding Jordan's private education at Variety School.

There are two issues to be resolved: (1) did the Hearings

Officer err in concluding that a FAPE was provided by the May 9,

July 12, and December 8, 2005 IEPs; and (2) did the DOE violate

the stay put provisions of the IDEA when Jordan's mental health

services were terminated on December 16, 2005.

For the reasons set forth below, the Decision of the

Administrative Hearings Officer is AFFIRMED IN PART AND DENIED IN

PART.

## PROCEDURAL HISTORY

On December 23, 2005, Jordan M., by and through his parents

Robert M. and Deborah M., filed a Request for Impartial Hearing

with the Department of Education ("DOE").

On March 23, 2006, the DOE filed a Motion to Dismiss the

request for due process hearing.

On April 6, 2006, the Office of Administrative Hearings,

Department of Commerce and Consumer Affairs, State of Hawaii

("Office of Administrative Hearings") held a hearing on the

Motion to Dismiss.

On April 10, 2006, the Hearings Officer issued an Order

Granting Respondent's Motion with Regard to Petitioners' Request

for Reimbursement for Private Placement ("April 10, 2006 Hearings Officer's Order").

On April 20, 2006 Plaintiffs filed a Complaint in Civil Number 06-00215 SOM-KSC, appealing the April 10, 2006 Order to the United States District Court. R.M., et al. v. Hamamoto, Civ No. 06-00215 SOM-KSC, (Doc. 1).

On January 19, 2007, United States District Court Judge Susan Oki Mollway issued an Order Denying Plaintiffs' Motion for Declaratory Relief and Remanding Case. R.M., et al. v. Hamamoto, Civ No. 06-00215 SOM-KSC, (Doc. 30).

On April 12, 13, and 30, 2007, and June 4, and 5, 2007, the Office of Administrative Hearings conducted an administrative hearing.

On July 20, 2007, Administrative Hearings Officer Richard A. Young issued the Findings Of Fact, Conclusions Of Law And Decision ("July 20, 2007 Hearings Officer's Decision"). (Administrative Record on Appeal ("RA"), Exh. 56.)

On August 14, 2007, Plaintiffs filed their Complaint in the instant action. (Doc. 1.)

On October 17, 2007, Defendant State of Hawaii filed the Answer. (Doc. 10.)

On November 8, 2007, the Court received the administrative record on appeal. (Docs. 12-24.)

On February 26, 2008 Plaintiffs filed an Opening Brief.

3

(Doc. 34.)

On March 28, 2008, Defendant filed an Answering Brief. (Doc. 36.)

On April 15, 2008 Plaintiffs filed a Reply to Defendant's Answering Brief. (Doc. 37.)

The matter came on for hearing on May 5, 2008. At the hearing, Plaintiffs discussed Administrative Hearings Officer Haunani H. Alm's Findings of Fact, Conclusions of Law and Decision filed on April 23, 2008, which concerns the same parties. The Court ordered Plaintiffs to file a copy of the April 23, 2008 Hearings Officer's Decision by May 6, 2008, and ordered that the parties file any comments about or response to the April 23, 2008 Hearings Officer's Decision by May 8, 2008. (Doc. 39.)

On May 5, 2008, Plaintiffs filed a Declaration of Carl M. Varady attaching a copy of Administrative Hearings Officer Haunani H. Alm's April 23, 2008 Findings of Fact, Conclusions of Law and Decision. (Doc. 38.)

On May 8, 2008, Plaintiffs filed a Supplemental Brief, (Doc. 40), and Defendant filed a Response To Plaintiffs' Filing Of An April 23, 2008 Hearing Decision, (Doc. 41).

A second hearing was held on May 9, 2008 before this Court. At the hearing, the Court affirmed the Hearings Officer's July 20, 2007 Decision with respect to the findings that the May 9,

4

July 12, and December 8, 2005 IEPs provided a FAPE.  The Court
took the remainder of the matter under submission.  (Doc. 42.)

## INDIVIDUALS WITH DISABILITIES EDUCATION ACT

Congress enacted the Individuals With Disabilities Education
Act ("IDEA") to financially assist state and local agencies in
educating students with disabilities.  See Ojai Unified Sch.
Dist. v. Jackson, 4 F.3d 1467, 1469 (9th Cir. 1993).  IDEA's goal
is "to ensure that all children with disabilities have available
to them a free appropriate public education that emphasizes
special education and related services designed to meet their
unique needs and prepare them for further education, employment,
and independent living . . . "  20 U.S.C. § 1400(d)(1)(A).  The
IDEA defines the term "free appropriate public education" as
"special education and related services that . . . are provided
in conformity with the individualized education program required
under section 1414(d) of this title."  20 U.S.C. § 1401(9).  The
educational and related services must be provided to the disabled
child in the least restrictive and appropriate environment.  20
U.S.C. § 1412(a)(5)(A).

The individualized education program ("IEP"), a detailed
individualized instruction plan, is the mechanism for ensuring a
free appropriate public education ("FAPE").  The IDEA defines an
IEP as "a written statement for each child with a disability that
is developed, reviewed, and revised in accordance with section

5

1414(d) of this title."  20 U.S.C. § 1401(14).  The "IEP Team"
that prepares the IEP consists of the student's parents, regular
teacher, special education teacher, a representative of the local
educational agency, other individuals with relevant knowledge
about the student's disability, and, where appropriate, the
student.  20 U.S.C. § 1414(d)(1)(B).

In addition to a substantive right to a FAPE, the IDEA and
its regulations provide certain procedural safeguards to parents.
For example, parents may examine all relevant records regarding
identification, evaluation, and educational placement of their
children; must receive prior written notice if a school proposes
or refuses to alter the child's identification, evaluation, or
educational placement; may request an impartial due process
hearing regarding the education of their disabled child; and may
obtain judicial review of an administrative decision they do not
agree with regarding the identification, evaluation, or
educational placement of their child.  20 U.S.C. §§ 1415(b)(1),
(b)(3), (b)(6), and (f); see 34 C.F.R. § 300.1 et seq.

Recipients of federal funds, such as the State of Hawaii,
Department of Education must "establish and maintain procedures
in accordance with [§ 1415] to ensure that children with
disabilities and their parents are guaranteed procedural
safeguards with respect to the provision of a [FAPE] by such
agencies."  20 U.S.C. § 1415(a).  The Department of Education has

6

implemented the IDEA by promulgating regulations for the
"Provision of a Free Appropriate Public Education for Student
with a Disability" contained in Title 8, Chapter 56 of the Hawaii
Administrative Rules.

<u>**SECTION 504 OF THE REHABILITATION ACT**</u>

Also at issue in this case is the relationship between the
IDEA, 20 U.S.C. § 1400 <u>et</u> <u>seq</u>., and Section 504 of the
Rehabilitation Act, 29 U.S.C. § 794(a).  Section 504 of the
Rehabilitation Act provides:

> No otherwise qualified individual with a disability in
> the United States, as defined in section 705(20) of
> this title, shall, solely by reason of her or his
> disability, be excluded from the participation in, be
> denied the benefits of, or be subjected to
> discrimination under any program or activity receiving
> Federal financial assistance . . .

29 U.S.C. § 794(a).

Section 504 further provides that "[t]he head of each such
agency shall promulgate such regulations as may be necessary to
carry out the amendments to this section made by the
Rehabilitation, Comprehensive Services, and Developmental
Disabilities Act of 1978."  Pursuant to Section 504, the Office
of Civil Rights, Department of Education, promulgated regulations
designed to eliminate discrimination in education on the basis of
disability.  <u>See</u> 34 C.F.R. § 104.31 <u>et</u> <u>seq</u>.; <u>see also</u> H.A.R. § 8-
53-1 <u>et</u> <u>seq</u>. ("Provision of a Free Appropriate Public Education
for Students with a Disability Under Section 504, Subpart D").

7

These regulations, like IDEA, provide that a school receiving federal funds "shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction . . . "  34 C.F.R. § 104.33(a).  A school may comply with the Rehabilitation Act regulations by implementing an individualized education program in accordance with the IDEA. See 34 C.F.R. § 104.33(b)(2).

Generally, to maintain an action under Section 504 of the Rehabilitation Act in the education context, plaintiffs must show that: (1) their children are disabled as defined by the Act; (2) their children are "otherwise qualified" to participate in school activities; (3) the School or the District receives federal financial assistance; and (4) their children were excluded from participating in, denied the benefits of, or subject to discrimination at, the school.  See W.B. v. Matula, 67 F.3d 484, 492 (3rd Cir. 1995).

**BACKGROUND**

I.   **Factual Background**

Jordan M., a boy born on June 26, 1992, was first diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), and Oppositional Defiant Disorder ("ODD") in 1999 at the age of seven when he was treated at Kahi Mohala psychiatric hospital. (11/8/1999 Kahi Mohala evaluation report, Pet. Exh. 28.)  In

8

October of 2000, Jordan began seeing a psychiatrist, Dr. Perry Heintz.

**2001-2004, Enchanted Lake Elementary School**

During the 2001-2004 school years, Jordan attended Enchanted Lake Elementary School, where he was placed in a fully self-contained classroom.  (5/17/04 IEP, Pet. Exh. 10 at 62 and 81.) In a letter dated October 9, 2003, Jordan's Parents wrote of their concerns about Jordan's transition from a fully self-contained class at Enchanted Lake to the classes at Stevenson Middle School in the next year.  (10/9/03 letter, Pet. Exh. 9.) At the meeting on May 17, 2004, the IEP Team noted some behavioral problems, but that Jordan was making educational progress in the small group setting of the special education classroom.  (5/17/04 IEP, Pet. Exh. 10 at 82 and 88.)

**2004-2005, Stevenson Middle School**

In the May 2004 Individualized Education Program ("IEP") the IEP team determined that Jordan would move from the fully self-contained classroom at Enchanted Lake, to Stevenson Elementary School's special education classes for his core subjects.  The IEP team also determined that Jordan was qualified to receive mental health extended school year services, but that he did not need academic services over the summer.  (Id. at 80 and 83.)

In the 2004-2005 school year, Jordan attended Stevenson

Middle School.  At the administrative hearing on the case,
Jordan's Mother testified that as the school year progressed
Jordan's interest in academics declined, and he became physically
violent at home.  (Testimony of Mother, Transcript 3, Vol. I at
84.)  Hanh Nguyen, student services coordinator at Stevenson
Middle School, testified that the violent behavior was not seen
at school, although he was aware that Jordan had sworn in class
in the past.  (Testimony of Hahn Nguyen, Transcript 6, Vol. IV at
722-23, 729, and 732.)  Jordan's special education teacher, Joan
Stone, testified that it is very common for a child's behavior to
be very different in the structured school setting than at home.
(Testimony of Joan Stone, Transcript 6, Vol. IV at 638.)  Special
education teacher Stone, went on to testify that Jordan made
progress in his goals and objectives during the school year, and
that Jordan was doing fine at school both academically and
behaviorally.  (Id. at 632, 634-35.)

**The May 9, 2005 IEP**

Following escalating behavioral problems at home, on April
20, 2005, Jordan was admitted to the residential treatment
facility at Kahi Mohala.  He was treated there until May 1, 2005.
(5/18/05 Discharge Summary, Pet. Exh. 37.)  At the request of the
parents, an IEP team meeting was held on May 9, 2005.  Prior to
the May IEP team meeting, Jordan's Mother told the DOE that
Jordan had been admitted to Kahi Mohala in April, and the Team

10

discussed Jordan's admission at the meeting.  (Testimony of
Mother, Transcript 3, Vol. I at 91-92; May 9 Meeting Minutes at
11, 21, 29, 66, and 75, Pet. Exh. 98.)

Before the IEP team met, the DOE issued a report on Jordan's
present levels of educational performance.  (May 4, 2005 Report,
Pet. Exh. 13 at 140.)  Jordan's needs included achieving more
self-confidence and independence in his work, taking more
responsibility for his mistakes and completing homework, learning
to tease other students less and to use less profane language,
and learning coping and anger management strategies.  On May 5, a
Behavioral Support Plan ("BSP") was developed.  (BSP, Pet. Exh.
38.)

At the May 9, 2005 IEP Team Meeting, it was determined that
Jordan was qualified for extended school year services for mental
health but not for academic extended school year services.  (May
9 IEP, Pet. Exh. 13.).  The IEP team also increased Jordan's
mental health services during the school year.  The May 9 IEP
further specified 1000 minutes per week of special education
classes.  Jordan would be in special education classes for math,
social studies, science, English and reading.  (May 9 IEP, Pet.
Exh. 13.)  While Jordan had a lower math score in the
standardized testing than the year before, he was earning
satisfactory grades in core subjects, including a B in
mathematics.  (2004-2005 Report Card, Pet. Exh. 22.)

**Enrollment in Variety School**

On May 16, Jordan's Parents sent a letter to special
education teacher Joan Stone stating that the May 9 offer of FAPE
was rejected because the IEP did not include academic extended
school year services, and because the DOE did not give the
parents the worksheet used to determine Jordan ineligible for
academic extended school year services.  The letter also informed
the DOE that Jordan would be attending Variety School for the
summer program that included academics.  (5/16/05 Letter, Pet.
Exh. 53.)

There was controversy at the administrative hearing as to
the May 18, Kahi Mohala discharge summary for Jordan's treatment
in April.  The testimony at the administrative hearing by special
education teacher Joan Stone, Student Services Coordinator Hahn
Nguyen, and Vice Principal Christina Alfred was that the parents
did not provide the DOE with a copy of the May 18, 2005 discharge
report.  (Stone Testimony, Transcript 6, Vol. IV at 636; Nguyen
Testimony, Transcript 6, Vol. IV at 723; and Alfred Testimony,
Transcript 6, Vol. IV at 757.)  Jordan's mother testified that
the discharge summary was given to the IEP Team sometime after
May 9, 2005 "when we got this ourselves."  (Mother's testimony,
Transcript 3, Vol. I at 91.)  Hearing Officer Young found the
parents to be uncooperative, but did not make a factual
determination as to whether they ever provided the May 18, 2005

discharge report to the DOE.

After the IEP Team met on May 9, 2005, Jordan's school made the effort "to formally update data with weekly progress checks from Jordan's teachers and to communicate that data to [Jordan's] parents via weekly e-mails" sent on May 13, 20 and 27, 2005. Hard copies of the progress reports were also given to Jordan's therapist.  (7/25/05 IEP meeting notes, Pet. Exh. 16 at 187.)

The DOE revised Jordan's Behavioral Support Plan on May 25, 2005.  (BSP, Pet. Exh. 14.)

**The July 12, 2005 IEP**

The June 6, Stevenson report card for 2004-2005 shows Jordan achieved satisfactory grades in core subjects, including a B in mathematics, and A in science, a B in social studies, and a C in English.  (Report Card, Pet. Exh. 22.)

On June 6, through June 24, Jordan was admitted to the residential treatment facility at Kahi Mohala.

On June 9, Jordan's Parents requested an IEP Team meeting to resolve disagreement over the May 9 IEP.

At the July 12 IEP Team meeting, the Parents informed the team that Jordan was treated at Kahi Mohala in June.  (Transcript of meeting, Pet. Exh. 99 at 493 & 524.)  The Parents' requests for academic extended school year services, a skills trainer, and a fully self-contained classroom were denied.  The Team concluded that additional information was needed going forward for Jordan

to determine his special education eligibility and IEP
programming.  The IEP Team requested information regarding
social, emotional, and learning disabilities.  (July 12 IEP, Pet.
Exh. 15 at 175.)

After the July 12, 2005 meeting, Jordan's Parents signed the
consent form to allow the DOE assessments to proceed.  Nine days
later, however, on July 21, Jordan's Mother sent a letter
requesting that further testing be stopped until Jordan's
emotions stabilized.  (Mother's Letter, Pet. Exh. 61.)  As of
July 21, the DOE had issued only the speech and language
assessment report.  Further observations of Jordan were placed on
hold.

**<u>The July 25, 2005 IEP</u>**

On July 13, 2005, Kahi Mohala issued a discharge summary for
the June stay stating that Jordan had been diagnosed with bipolar
disorder, ADHD, ODD, learning disorder and psychological and
environmental problems - difficulties with primary support group,
social environment and educational.  The July 13 Kahi Mohala
discharge summary, however, was not provided to the DOE until
four months later, at the November 4, 2005 Eligibility Meeting.
(11/4/2005 Meeting Notes, Pet. Exh. 18.)

On July 25, 2005 the IEP Team met again, at the request of
Jordan's parents, to discuss Jordan's IEP.  (6/9/05 letter from
Mother, Pet. Exh. 55; and 6/20/05 letter from Mother, Pet. Exh.

14

56.)  The IEP Team was unable to complete the agreed upon agenda
for the meeting, including sharing the data which had been
incorporated into the measure of Jordan's present levels of
educational performance, because Jordan's Parents left the
meeting after introductions were made and the procedural
safeguards were shared.  (Id. at 187-188.)  Jordan's Parents left
after DOE declined their request for a copy of the worksheet used
in May to determine that Jordan did not qualify for academic
extended school year services.  (Stone Testimony, Transcript 6,
Vol. IV at 655-58.)  As required by the IDEA, the IEP Team went
on to issue the July 25 IEP, which continued the services
provided in the July 12 IEP.  (Id.)

**2005-2006 School Year**

On August 22, Jordan's Parents informed the Principal of
Stevenson by letter that Jordan would stay at Variety School for
the coming academic year.  (8/22/05 facsimile letter, Pet. Exh.
69.)  The Parents stated they feared that because the evaluations
of Jordan were not complete, Jordan would regress if they sent
him back to Stevenson without first settling their objections to
the current IEP.  (7/12/05 IEP Meeting Minutes, Pet. Exh. 99 at
524.)  The Parents thereafter gave the Director of Variety School
their permission for the DOE testing to re-commence.  (8/22/05
facsimile letter, Pet. Exh. 69.)

Through the latter half of September and the beginning of

15

October, the evaluations of Jordan were worked on and completed. These included the following: the September 21, 2005 DOE intellectual evaluation report showing Jordan's IQ to be 78; the September 27 classroom observation report issued by DOE special education teacher Ms. Stone; the September 28 academic evaluation showing that Jordan was functioning in the average to low average range; the October 11 DOE School Social Work Report and Report of Adaptive Behavior Testing; and the October 19 Comprehensive Emotional Behavioral Assessment issued by Dr. Tokuda, Psy.D.. (Intellectual Evaluation, Pet. Exh. 41; Classroom Observation, Pet. Exh. 42; Academic Evaluation, Pet. Exh. 44; Social Work Report, Pet. Exh. 45; and Emotional Assessment, Pet. Exh. 46.)

**The December 8, 2005 IEP**

On December 8, 2005 an annual IEP team meeting was held.  At the time, unknown to the DOE, Jordan was undergoing a private neuropsychological evaluation by Dr. Peggy Murphy-Hazzard, Psy.D..  Jordan's parents did not tell the IEP Team about the evaluation or that the report was imminent. (12/8/05 IEP, Pet. Exh. 19.)

In the IEP formulated at the December 8, 2005 meeting, the IEP team determined that Jordan would receive Academic extended school year services, and an educational aide would be provided in school to monitor Jordan during non-class times.  The Parent's requests for placement in a fully self-contained classroom and

16

the assistance of a skill trainer were considered, but the IEP
Team determined the services were not appropriate.  The minutes
of the meeting note that Jordan's "Parents agreed to respond to
the school's offer of FAPE by December 16, 2005."  (Id.)

The day after the completion of the December 8, 2005 IEP, on
December 9, Jordan's Parents faxed a letter to DOE special
education teacher Stone, informing the DOE of Jordan's evaluation
by Dr. Murphy-Hazzard and that the results should be available
within the next two weeks.  The Parents asked the DOE to
"consider postponing your offer [of a FAPE] until the results are
made available and schedule a meeting with Dr. Murphy-Hazzard to
review her evaluation."  (12/9/05 facsimile letter, Pet. Exh.
75.)  On December 12, a copy of the December 9 letter to DOE
special education teacher Stone was sent to the DOE by facsimile.
(Pet. Exh. 75.)  On the same day, DOE Principal Amine of
Stevenson replied to Jordan's Parents by letter.  The letter
states that the Parent's December 9 faxed letter had been
received.  Principal Amine then reiterated the DOE request that
the Parents respond to the offer of FAPE by December 16, and told
the Parents that "If you reject FAPE, all related services cease
as of December 17, 2005."  The letter goes on to say that:

> An IEP meeting can be called by either party at any
> time.  When you have information ready to share, please
> contact the school to schedule a meeting.  If there are
> assessments, we would appreciate seeing them prior to
> the meeting.

17

> Please know that we would be happy to welcome Jordan
> back to our campus!  School resumes on Tuesday, January
> 10, 2006 after the upcoming intersession.  Attached
> please find a copy of Jordan's schedule, a bell
> schedule, and a school calendar.  Dr. George has told
> us he would be available on Tuesday, January 10 before
> school to greet Jordan.

(Pet. Exh. 77.)  The Parents were requested to contact the school

when they had information ready to share, and to contact the

school to schedule a meeting.  (12/12/05 letter, Pet. Exh. 77.)

On December 16, 2005, Jordan's Parents sent a letter to the

DOE which the DOE received on December 21, 2005.  The letter

informed the DOE that the Parents expected to provide the DOE

with the report of Dr. Murphy-Hazzard no later than December 21,

2005.  The Parents requested the DOE to postpone the termination

of Jordan's related services, and proposed that another IEP Team

meeting be scheduled within the next two weeks.  (12/16/05

letter, Pet. Exh. 78.)

On December 19, the DOE sent a letter to Jordan's parents

stating that all related services had been stopped because the

FAPE offered in the December 8, IEP was not accepted by the

December 16 deadline.  The letter went on to state:

> However, should you decide to accept FAPE in the
> future, we are willing and able to meet with you.  As
> you are aware, Jordan's IEP was carefully constructed
> incorporating recent assessment data and input by you
> and his teachers.  Further, we will consider any
> additional pertinent information you provide to us.

(12/19/05 letter, Pet. Exh. 79.)

18

On December 20, Dr. Murphy-Hazzard issued a
neuropsychological evaluation, received by the DOE on December
21, diagnosing for the first time that Jordan suffers from
Asperger's Syndrome.  (Murphy-Hazzard Report, Pet. Exh. 47.)  The
DOE received a copy of the evaluation on December 21.  (Murphy-
Hazzard Report date stamped 12/21/05, Resp. Exh. 24.)

The DOE offered to hold another IEP meeting in the December
12 and December 19, 2005 letters sent to Jordan's parents, but on
December 23, 2005, Jordan's Parents filed a request with the DOE
for a due process hearing.  (Due Process Request, Pet. Exh. 1.)

## II.   <u>Procedural Background</u>

### A.   <u>The Prior U.S. District Court Action: *R.M., et al v. Hamamoto*, Civil Number 06-00215 SOM-KSC</u>

On December 23, 2005, Jordan's parents filed a request for
impartial hearing, requesting reimbursement for costs incurred in
their unilateral placement of their son in Variety School for the
2005 summer program, and the 2005-2006 academic school year.

On March 23, 2006, the State of Hawaii Department of
Education ("DOE"),[1] filed a motion to dismiss Parents' request,
asserting that their request was untimely under Haw. Rev. Stat.
§ 302A-443.  HRS § 302A-443 provides for a 90-day statute of
limitation for requests for hearings "where the request is for

---

[1] Both the DOE and Patricia Hamamoto are named as Defendants
in this appeal.  For purposes of this order, the court refers to
both Defendants as "the DOE."

reimbursement of the costs of [a unilateral] placement." On
April 10, 2006, after a hearing on the motion, the hearing
officer concluded that the Parents' request for reimbursement was
untimely under Haw. Rev. Stat. § 302A-443. (Record on Appeal in
Civil Number 06-00215 at 61-62.) On April 18, 2006, the hearing
officer stayed his proceedings and vacated the scheduled hearing
dates to allow the Parents to appeal the April 10, 2006, ruling
on timeliness. (Record on Appeal in Civil Number 06-00215 at
109-10.) On appeal, in their motion for declaratory relief,
Jordan's Parents contended that the limitation period in Haw.
Rev. Stat. § 302A-443 was inapplicable because: (1) the DOE
failed to inform them that the limitation period had changed on
June 24, 2005; and (2) equitable tolling applies. (Doc. 16 in
Civ. No. 06-00215.)

On January 19, 2007, U.S. District Court Judge Susan Oki
Mollway remanded the matter to the Administrative Hearings
Officer, directing the hearings officer to determine the
applicable statute of limitations and whether the doctrine of
equitable tolling applied. (Doc. 30 in Civ. No. 06-00215.) If
the Hearings Officer reached the merits, he was to determine when
Jordan was placed at Variety School and whether the Parents were
entitled to reimbursement for Jordan's placement at Variety
School in the summer of 2005, and through the 2005-2006 school
year. (Id.)

**B.   THE JULY 20, 2007 HEARINGS OFFICER'S FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION**

Administrative Hearings Officer Richard A. Young heard Plaintiffs' case on April 12-13, April 30, and June 4, 2007. On July 20, 2007, the Administrative Hearings Officer issued an order entitled "Findings Of Fact Conclusions Of Law And Decision" ("July 20, 2007 Hearings Officer's Decision"). In the 2007 Decision, the Administrative Hearings Officer found that equitable tolling applied to the Parents' request for reimbursement, thereby finding their appeal timely made. After review of the merits of the appeal, the Hearings Officer found that the Parents were not entitled to reimbursement because the May 9, July 12, and December 8, 2005 IEPs offered Jordan a FAPE. (July 20, 2007 Hearings Officer's Decision at 16-17, RA., Exh. 56.)

In this action, the Plaintiffs appeal the July 20, 2007 Decision of Hearings Officer Young that the May 9, July 12, and December 8, 2005 IEPs provided a FAPE and that the DOE violated the stay-put provision of the IDEA. Hearings Officer Young's Decision regarding the statute of limitations and the applicability of equitable tolling was not appealed by the DOE.

**STANDARD OF REVIEW**

The standard for reviewing administrative decisions in IDEA cases has been described as "modified de novo." <u>Bucks County</u>

Dep't. of Mental Health/Mental Retardation v. Pennsylvania, 379 F.3d 61, 65 (3rd Cir. 2004).   In evaluating an appeal of an administrative decision under IDEA, a district court "shall receive the records of the administrative proceedings...shall hear additional evidence at the request of a party; and...basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."   20 U.S.C. § 1415(i)(2)(C).

The Supreme Court articulated its interpretation of the statute's standard of review in Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley, 458 U.S. 176, 206, 102 S.Ct. 3034, 3035 (1982).   "[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."   Id.   The statute requires that "due weight" be given to the findings in the administrative proceedings.   Id.

The Ninth Circuit Court of Appeals has held that the amount of deference given to an administrative hearings officer's findings depends on the thoroughness of the findings.   Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 891 (9th Cir. 1995).   More deference is accorded when the hearings officer's findings are "thorough and careful."   Id.   The court has

22

discretion to decide the amount of deference it gives to the administrative findings.  County of San Diego v. California Spec. Educ. Hearing Office, 93 F.3d 1458, 1466 (9th Cir. 1996).  The ultimate determination of the appropriateness of the educational program is reviewed de novo.  Capistrano Unified Sch. Dist., 59 F.3d at 891.

A court's inquiry in reviewing administrative decisions under IDEA is twofold.  "First, has the State complied with the procedures set forth in the Act?  And second, is the [IEP] developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?"  Rowley, 458 U.S. at 206-07 (footnotes omitted); Union Sch. Dist. v. Smith, 15 F.3d 1519, 1524 (9th Cir. 1994).

## BURDEN OF PROOF

Under the Individuals with Disabilities in Education Act (IDEA), the burden of proof in an administrative hearing challenging an Individualized Education Program (IEP) is placed upon the party seeking relief, whether that is the disabled child or the school district.  Schaffer ex rel. Schaffer v. Weast, 126 S.Ct. 528, 537 (2005) ("The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief.").  Here, Plaintiffs challenged Jordan's IEP at the administrative hearing, and had the burden of proving that the school district's evaluation and proposed student placement

did not comply with the IDEA requirements.

The party challenging the administrative decision bears the burden of proof in seeking review in the district court.  <u>Clyde K. v. Puyallup School District, No 3</u>, 35 F.3d 1396, 1398-99 (9th Cir. 1994), <u>superseded by statute on other grounds</u>, Individuals with Disabilities in Education Act, Pub.L. No. 105-17, 111 Stat. 37; <u>Seattle School Dist., No. 1 v. B.S.</u>, 82 F.3d 1493, 1498 (9th Cir. 1996)(School district challenging administrative ruling concerning its proposed placement of disabled child had burden of proving compliance with Individuals with Disabilities Education Act (IDEA) in district court.).  Plaintiffs bear the burden of proof as the party challenging the Hearing Officer's Decision.

<u>**ANALYSIS**</u>

At the due process hearing held in April and June 2007, Hearings Officer Young considered whether the May 9, July 12, and December 8, 2005 Individualized Education Programs ("IEPs") provided Jordan a FAPE.  (July 20, 2007 Hearings Officer's Decision, RA, Exh. 56.)

At the administrative hearing before Officer Young, the Parents contended that the December 8, 2005 IEP should have taken into account the findings and recommendations contained in Dr. Peggy Murphy-Hazzard's report which was not available until December 20, 2005.  In determining that the December 8, 2005 IEP provided Jordan a FAPE for the 2005-2006 school year, Hearings

24

Officer Young pointed out that the DOE was not informed by the
Parents that an evaluation was taking place and could not know
there would be a new diagnosis of Asperger's syndrome later on
December 20, 2005.  The Hearings Officer also relied on the
Parents' lack of cooperation once the new diagnosis was received
by the DOE.  The Parents once again exited the meeting on January
6, 2006, before it was completed.

Before Hearings Officer Young was the question of whether
the December 8, 2005 IEP, as well as the two earlier IEPs,
provided a FAPE for the 2005-2006 school year.  Plaintiffs appeal
the Decision of Hearings Officer Young that Jordan was provided a
free appropriate public education ("FAPE") on May 9, July 12, and
December 8, 2005.  Although federal courts are to give due weight
to the findings of the administrative hearings officer in an IDEA
case, the amount of deference given directly depends on the
thoroughness of the findings.  Capistrano Unified Sch. Dist. v.
Wartenberg, 59 F.3d 884, 891 (9th Cir. 1995).  The Court has
discretion to decide the amount of deference to be given to the
administrative findings.  County of San Diego, 93 F.3d at 1466
(9th Cir. 1996); see also Gregory K. v. Longview Sch. Dist., 811
F.2d 1307, 1311 (9th Cir. 1987) ("How *much* deference to give
state educational agencies . . . is a matter for the discretion
of the courts[.]"  "[T]he court is free to accept or reject the
findings in part or in whole.").

25

The Hearings Officer's July 20, 2007 Decision is entitled to deference.  The Decision is characterized by a thorough analysis of the testimony and evidence provided.  Hearings Officer Young considered all of the scholastic records and evaluations when they became available to the DOE.  It is clear he performed a conscientious evaluation of all of the evidence, including the testimony, in reaching his determination that Jordan was provided with a FAPE.  The conclusions of the Hearings Officer are the result of a "thorough and careful" analysis of evidence presented and are worthy of deference.  <u>Capistrano</u>, 59 F.3d at 891 (9th Cir. 1995).

I.   **<u>THE MAY 9, JULY 12, AND DECEMBER 8, 2005 IEPS PROVIDED A FAPE</u>**

   A.   **<u>The DOE Has Complied With The Procedures Set Forth In The IDEA</u>**

Pursuant to the IDEA, the DOE is required to ensure that each IEP include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide.  20 U.S.C. § 1414(d)(1)(A).

The IEP team determined that Jordan would be given updated assessments on July 12, 2005.  The assessments were delayed, however, by Jordan's Parents.  Parental cooperation in the process of evaluating a child is a factor to be considered in

26

determining if a FAPE was provided.  <u>See</u> <u>Patricia P. v. Board of</u>
<u>Educ. of Oak Park</u>, 203 F.3d 462, 469 (7th Cir. 2000) ("[W]e hold
that parents who, because of their failure to cooperate, do not
allow a school district a reasonable opportunity to evaluate
their disabled child, forfeit their claim for reimbursement for a
unilateral private placement." ).  The Parents stopped the DOE
from evaluating Jordan when, on July 21, 2005, they requested
that further testing be stopped.  (Mother's Letter, Pet. Exh.
61.)

The DOE assessments were allowed to continue later but were
not finalized until September and October of 2005, after the
Parents placed Jordan at the private school Variety for the fall
term.  The IEP Team was then able to incorporate the assessments
into the development of the December 8, 2005 IEP.

The IEP Team disputes the allegation they were ever given
the May 18, 2005 Kahi Mohala discharge report concerning Jordan's
treatment in April.  The IEP Team had no information at the
December 8, 2005 IEP meeting that Jordan was being evaluated by a
neuropsychologist.  The DOE's assessments satisfy the IDEA and
applicable regulations, and contained no procedural violations.

**B.**  **The IEPs Are Reasonably Calculated To Enable Jordan To**
     **Receive Educational Benefits**

Plaintiffs take issue with the three IEP's, claiming that
the DOE failed to provide a FAPE by: (1) failing to provide

appropriate mental health services; (2) failing to provide extended school year services in academics; and (3) offering an inappropriate placement.

The IDEA requires that individuals with disabilities be provided a FAPE designed to meet the unique needs of the student. 20 U.S.C. § 1400(d)(1).  An education is appropriate if it "(1) addresses [the student's] unique needs, (2) provides adequate support services so [the student] can take advantage of the educational opportunities, and (3) is in accord with the individualized education program."  <u>Capistrano</u>, 59 F.3d at 893; <u>see also</u> <u>Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist.,</u> <u>Westchester County v. Rowley</u>, 458 U.S. 176, 188-189 (1982).  An appropriate education "does not mean the absolutely best or 'potential-maximizing' education for the individual child." <u>Gregory K. v. Longview Sch. Dist.</u>, 811 F.2d 1307, 1314 (9th Cir. 1987).  Rather, the state must only provide "a basic floor of opportunity" for the student.  <u>Id</u>.  Although a family's preferred schooling may be more beneficial for the student than the DOE's proposed placement, this alone does not make the DOE's placement inappropriate.  <u>Gregory K.</u>, 811 F.2d at 1314.

The Court finds the Hearings Officer to be correct in finding that the IEPs developed in 2005 for use at Stevenson Middle School did meet Jordan's needs.

### 1.   **Mental Health Services**

Psychological behavioral and emotional goals are properly addressed through an IEP when they "affect academic progress, school behavior and socialization." County of San Diego v. California Special Education Hearing Office, 93 F.3d 1458, 1467 (9th Cir. 1996).  The suitability of a student's IEP is determined by "whether the child makes progress toward the goals set forth in her IEP." County of San Diego, 93 F.3d 1458, 1467 (9th Cir. 1996).

In challenging the Hearings Officer's conclusion that Jordan's IEPs provided adequate mental health services, Plaintiffs point to Jordan's problems at home and to the development of Jordan's behavioral support plan in May 2005 after Jordan's first residential treatment at Kahi Mohala from April 20 through May 1, 2005.  (Opening Brief at 30 and 32, Doc. 34.)

Jordan was first admitted for residential treatment at Kahi Mohala on April 20 through May 1, 2005.  Prior to the May 9, 2005 IEP team meeting, Jordan's Mother told the DOE that Jordan had been admitted to Kahi Mohala on April 20, 2005.  The IEP Team could not have had the discharge summary on May 9, 2005 as it was not even prepared until May 18, 2005.

After the DOE learned that Jordan was admitted to the Kahi Mohala residential treatment facility, the IEP Team took that fact into account and added mental health services to Jordan's IEP.  (May 9 Meeting Notes at 149, Pet. Exh. 13; May 25, 2005

29

behavioral support plan, Pet. Exh. 14.)  The May 9 IEP, including

the Behavioral Support Plan, increased Jordan's mental health

services from 45 minutes a week to 1080 minutes per quarter.

Meanwhile, Jordan had achieved satisfactory grades for the 2004-

2005 school year in core subjects, including a B in mathematics,

an A in science, a B in social studies, and a C in English.

(June 6, 2005, Stevenson report card for 2004-2005, Pet. Exh.

22.)

The additional mental health services added in the May 9,

2005 IEP continued in the July 12, 2005 IEP and December 8, 2005

IEP.

The December 8, 2005 IEP Team was given the July 13, 2005

Kahi Mohala discharge summary on November 4, 2005.  They also

considered Jordan's satisfactory report card for 2004-2005, and

all of the DOE assessments completed by October, 2005.  The

evidence shows Jordan did not exhibit severe emotional problems

at school that would affect his ability to be educated.  The

testimony of Jordan's student services coordinator teacher Hhan

Nguyen is that Jordan did not display severe emotional or

behavioral problems in the school setting.  Further, Jordan's own

treating psychiatrist, Dr. Perry Heintz, testified at the

administrative hearing that Jordan made significant gains in his

behavior during the relevant period.  During the years Dr. Heintz

treated Jordan, he did not diagnose Jordan as suffering from

Asperger's Syndrome prior to receiving Dr. Murphy-Hazzard's
December 20, 2005 report.  (Heintz testimony, Transcript 4, Vol.
II at 290-291, 300-303.)

Plaintiffs fail to show that Jordan's IEPs did not support
him in achieving his academic and behavioral IEP goals.  The
finding of the Hearings Officer that Jordan's mental health
issues were appropriately addressed by the DOE in the relevant
IEPs is worthy of deference.

### 2.  Extended School Year Services

Plaintiffs contend that Jordan was not provided a FAPE
because they believe he required extended school year academic
services during the summer of 2005, which were not required by
the May 9, 2005 IEP.

The IEP meeting notes for May 9, 2005 record that Jordan did
not show regression or recoupment problems in his academic
abilities.  (Pet. Exh. 13 at 149.)  Jordan had achieved good
grades in core subjects throughout the 2004-2005 school year at
Stevenson, despite his stay at Kahi Mohala in May.  (Report Card,
Pet. Exh. 22.)  The evidence does not support a showing that
Jordan required extended school year academic services in the
summer of 2005.

### 3.  Least Restrictive Environment

Jordan's Parents wanted Jordan placed in a fully self-

31

contained classroom with a skills trainer for the 2005-2006 school year.  Jordan's December 8, 2005 IEP placed him in special education classes in core subjects, and in general classes for electives and other school activities.  The December 8, 2005 IEP placement was a continuation of the one Jordan was given in the 2004-2005 school year.

The statutory preference of IDEA is to mainstream the education of a disabled child to the extent possible given the nature of the child's disability.  20 U.S.C. § 1412 (a)(5)(A).  When main-streaming is pursued with a disabled child, and the child's education proceeds in the "Least Restrictive Environment," as set forth in 20 U.S.C. § 1412 (a)(5)(A), the crucial purposes and requirements of IDEA are realized.  The disabled child receives the educational and social benefit of observing and working with non-disabled students.

The least restrictive environment provisions of the IDEA require the DOE to ensure, to the maximum extent appropriate, that Jordan be educated with students who are not disabled.  Haw. Rev. St. § 8-56-43(1).  A mix of special education for core subjects and main-streaming for non-academic subjects was appropriate in light of the information available to the IEP team.  Jordan achieved satisfactory grades in his core subjects during the 2004-2005 school year.  (Report Card, Pet. Exh. 22.) Jordan's IEP Team thoroughly considered the DOE assessments

concluded in October 2005.  The IEP Team determined that Jordan qualified for academic extended school year services in the core subjects of math and language arts.  The extended school year services were put in place to address Jordan's anxiety issues and to aide in his transition to high school.  The extended school year mental health services were kept in place to combat regression of Jordan's relationship and coping skills, and of his gains in emotional awareness.  (12/8/05 IEP Meeting Notes, Pet. Exh. 19 at 230-31.)

The Ninth Circuit Court of Appeals in the case of Sacramento City Unified School District, Board of Education v. Rachel H., set out four criteria for determining the least restrictive environment: (1) the educational benefits of a regular classroom, with supports, as opposed to a special education classroom; (2) the non-academic benefits of interaction with non-disabled children; (3) the effects of the placement on the teacher and other children; and (4) the cost of main-streaming.  Sacramento City Unified School District, Board of Education v. Rachel H., 14 F.3d 1398 (9th Cir. 1994).

Hearings Officer Young took into consideration Jordan's "low average to average academic abilities" and "full scale IQ of 78" in agreeing with the IEP determination that Jordan should be placed in special education in his core subjects.  (RA, Exh. 56 at 380, 383, 386-87.)  The Hearings Officer weighed the testimony

33

of special education teacher Stone that Jordan displayed few behavioral problems at Stevenson, and the testimony of Jordan's psychiatrist that Jordan's behavior had improved, and concluded that the evidence did not show that a self contained classroom was necessary.  (<u>Id.</u> at 387.)  The record supports the conclusion.  Plaintiffs fail to show that Jordan's placement as set out in the May 9, July 12, and December 8, 2005 IEPs was inappropriate.

### 4. <u>The Provision Of A Fape: December 8 Through The End Of The 2004-2005 School Year</u>

Plaintiffs contend that the December 8, 2005 annual IEP did not provide a FAPE because the IEP did not take into account the later findings and recommendations contained in Dr. Murphy-Hazzard's December 20 report diagnosing Jordan with Asperger's Syndrome.

When the December 8, 2005 IEP was formulated, the Parents chose not to tell the IEP team that Jordan was being assessed by Dr. Murphy-Hazzard, or that her report was imminent.  (12/8/05 IEP, Pet. Exh. 19; Testimony of special education teacher Joan Stone, Transcript 6, Vol. IV at 668.)  The DOE only later received the report on December 21, 2005.  (Murphy-Hazzard Report date stamped 12/21/05, Resp. Exh. 24.)

The administrative hearing record also shows that the DOE organized an IEP team meeting on January 6, 2006 to begin to

34

discuss the December 20, 2005 evaluation.  The IEP team initially agreed to set another meeting to discuss a revision of Jordan's IEP in light of the Asperger's Syndrome diagnosis.  The meeting ended, however, when Jordan's father stated "Ok you know what if we're going to interrupt, I'm done.  I don't want to speak and listen anymore.  Let's go to due process."  The statement was interpreted by the DOE as a refusal to attend a further IEP team meeting.  (Pet. Exh. 100; Testimony of Vice Principal Christina Alfred, Transcript 7, Vol. V at 845-46.)

Hearings Officer Young concluded from the evidence presented and the testimony given that Jordan's Parents initially withheld information from the DOE regarding Jordan's assessment, and then declined to participate in another IEP team meeting to incorporate the diagnosis of Asperger's Syndrome into Jordan's educational plan.  (July 20, 2007 Hearings Officer's Decision at 14.)

At the May 9, 2008 hearing before this Court, Plaintiffs raised the Findings Of Fact, Conclusions Of Law And Decision filed on April 23, 2008 by Hearings Officer Haunani H. Alm. (April 23, 2008 Hearings Officer's Decision, Exh. 1, Doc. 38.) In the April 23, 2008 Hearings Officer's Decision, Hearings Officer Alm considers the events in December, 2005 and January 2006 in evaluating her decision as to the 2006-2007 school year.

It is the July 20, 2007 Decision of Hearings Officer Young

that is before this Court, and the Court finds the conclusions of Hearings Officer Young worthy of deference.  Parents of a student qualified for services under the IDEA may not withhold critical information from the IEP team, and then claim a FAPE was not provided.  See Patricia P. v. Board of Educ. of Oak Park, 203 F.3d 462, 469 (7th Cir. 2000) ("[T]his Court will look harshly upon any party's failure to reasonably cooperate with another's diligent execution of their rights and obligations under the IDEA.").  The December 8, 2005 annual IEP provided a FAPE through the end of the 2004-2005 school year.

## II.   **THE DOE'S CESSATION OF MENTAL HEALTH SERVICES**

Jordan's parents contend that the Department of Education ("DOE") violated the stay put provision of the IDEA when the DOE stopped providing mental health services briefly in December of 2005.  (Opening Brief at 36, Doc. 34; 12/23/05 Request for Impartial Hearing, Pet. Exh. 1 at 6.)

Section 1415(j) of Title 20 of the United States Code, "commonly referred to as the 'stay put' provision, requires the educational agency to maintain a disabled child's educational program until any placement dispute between the agency and the child's parents is resolved."  Johnson ex rel. Johnson v. Special Educ. Hearing Office, State of Cal., 287 F.3d 1176, 1179 (9th Cir. 2002).  The "stay-put" provision directs that:

"During the pendency of any proceedings conducted

36

> pursuant to [§ 1415], unless the State or local
> educational agency and the parents or guardian
> otherwise agree, the child shall remain in the then
> current educational placement of such child...."

§ 1415(e)(3).  For the purpose of IDEA "stay put" provision, the "current educational placement" is typically the placement described in the child's most recently implemented Individualized Education Plan (IEP).  20 U.S.C. § 1415(j).  Id. at 1180.

Plaintiffs, to be entitled to relief under the stay-put provision, must identify a fundamental change in, or elimination of, a basic element of the handicapped child's education program in order for the change to qualify as a change in educational placement.  Moss v. Smith 794 F.Supp. 11 (D. D.C. 1992).  "The term 'change in educational placement' should be given an expansive reading, at least where changes affecting only an individual child's program are at issue."  DeLeon v. Susquehanna Community School District, 747 F.2d 149, 153 (3rd Cir. 1984).  If the cessation in services is "likely to affect in some significant way the child's learning experience," there is a change in placement.  Id.

In complying with the IDEA's stay-put provision, the district court must interpret "educational placement" to incorporate enough flexibility to encompass the child's experience.  20 U.S.C.A. § 1415(j).  John M. v. Board of Educ. of Evanston Tp. High School Dist. 202, 502 F.3d 708, 715 (7th Cir.

37

2007).  For Jordan, the educational experience incorporated
mental health services.  Mental health services were increased in
the May 9, 2005 IEP, and remained part of the IEPs for July and
December of 2005.

The decision to add mental health services to Jordan's
placement must have been made for educational purposes in order
for the stay-put provisions of 20 U.S.C.A. § 1415(e)(3) to apply.
Psychological behavioral and emotional goals are properly
addressed through an IEP when they "affect academic progress,
school behavior and socialization."  County of San Diego v.
California Special Education Hearing Office, 93 F.3d 1458, 1467
(9th Cir. 1996).  Jordan's IEPs, beginning with the May 2005 IEP,
provided 1080 minutes per quarter of mental health services.  In
the Prior Written Notice dated May 9, 2005, Burton Amine,
Principal of Stevenson Middle School, notes that the mental
health services were added to improve Jason's "coping skills and
relationship skills" in school.  (Pet. Exh. 13 at 13.)  The
mental health services were added to Jordan's IEP to enable him
to access his education, that is, for educational purposes.

Jordan's mental health services are a substantial component
of his educational program.  When the DOE stated in the December
12, 2005 letter from Stevenson's Principal to Jordan's Parents
that all related services would cease on December 17, 2005, the
Parents had yet to file a request for an impartial due process

38

hearing.  (12/12/05 letter, Pet. Exh. 77; <u>see also</u>, 12/19/05

letter from Principal Burton Amine stating that "all related

services have been ceased," Resp. Exh. 25.)  On January 6, 2006,

a resolution session was held in response to the Parents filing a

request for a due process hearing on December 23, 2005.  At the

January 6, 2006 session, the DOE stated that all services were to

be reinstated "as part of stay put should [Jordan] remain at his

DOE home school."  (1/6/06 Resolution Session Summary, Pet. Exh.

3 at 13.)  Jordan's father testified at the administrative

hearing that Jordan's mental health therapy continued following

the filing on December 23, 2005 of the request for an impartial

due process hearing, and the resolution session.  (Father's

testimony, Transcript 4, Vol. II at 360, 370-71.)

     The cessation of mental health services on December 17, 2005

constitutes a violation of the stay-put provision as the December

8, 2005 IEP providing the services was still the governing IEP

for Jordan.  The DOE is required to reimburse Plaintiffs for

reasonable counseling services that Plaintiffs privately funded

during the time period from December 17, 2005, through January 6,

2006, when the DOE failed to honor the stay-put provision.

## III. <u>REIMBURSEMENT OF PRIVATE SCHOOL TUITION</u>

     Jordan's parents request that the Department of Education

("DOE") reimburse Jordan's private tuition costs.  (Compl. at 5-

6, Doc. 1.)

A.   <u>Relevant Law</u>

The Court, basing its decision on a preponderance of the evidence, shall grant such relief as is appropriate.  20 U.S.C. § 1415(i)(2)(C)(iii).  Title 34 of the Code of Federal Regulation § 300.403(C) provides that "a court or a hearing officer may require the agency to reimburse the parents for the cost of [private school] enrollment if the court or hearing officer finds that the agency had not made FAPE available to the child in a timely manner prior" to the disabled child's enrollment in private school.

The United States Supreme Court has held that the IDEA supports reimbursement as an appropriate remedy for the failure of the school district to offer a FAPE.  <u>Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ.,</u> 471 U.S. 359, 370 (1985). Equitable considerations are relevant in fashioning the appropriate reimbursement.  <u>Burlington Sch. Comm.</u>, 471 U.S. 374. The Ninth Circuit Court of Appeals has held that a court may order a school district to reimburse parents who have unilaterally placed their child in a private special education program if: (1) the placement offered in the IEP was not an offer of FAPE, and (2) the private school placement was appropriate. <u>Union Sch. Dist. v. B. Smith</u>, 15 F.3d 1519, 1527 (9th Cir. 1994) (<u>citing</u> <u>Burlington Sch. Comm.</u>, 471 U.S. at 369); <u>see</u> 20 U.S.C. § 1412(a)(10)(C)(ii).

40

B.   **Analysis**

Here, Jordan was provided with a FAPE by the DOE in the May 9, July 12, and December 8, 2005 IEPs.  The DOE is not required to reimburse Jordan's parents for the costs of his placement in the Variety School during the summer of 2005, or during the 2005-2006 school year.

IV.   **ATTORNEYS' FEES**

Plaintiffs have also requested an award of attorney's fees. (Compl. at 7, Doc. 1.)  Pursuant to 20 U.S.C. § 1415(i)(3)(B), the Court, in its discretion, may award reasonable attorneys' fees to the parents of the disabled child if they prevail on appeal from an administrative hearing.  <u>Shapiro ex rel. Shapiro</u> <u>v. Paradise Valley Unified School Dist. No. 69</u>, 374 F.3d 857 (9th Cir. 2004) (the district court did not abuse its discretion in determining that parents were "prevailing parties" for IDEA purposes, where they prevailed on several significant aspects of their claim and were awarded money damages).

Plaintiffs have not prevailed in this action on significant aspects of their claim because a FAPE was provided to Jordan by the DOE, and the Decision of the Hearings Officer regarding the sufficiency of the May 9, July 12, and December 8, 2005 IEPs is affirmed.  The only point on which Plaintiffs' appeal is successful is a small one, the reimbursement for the short period from December 17, 2005 through January 6, 2006 during which the

41

DOE violated the stay-put provision by stopping Jordan's mental health related services.  Id. (Buckhannon's definition of "prevailing party", requiring a 'material alteration of the legal relationship of the parties', applies to the IDEA's attorney's fees provision, 20 U.S.C. § 1415(i)(3)(B)) (quoting Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 121 S.Ct. 1835, 1840 (2001)).

Jordan's parents' request for an award of reasonable attorneys' fees and costs is DENIED.  20 U.S.C. § 1415(i)(3)(B).

## V.    THE SECTION 504 AND ADA CLAIMS

Plaintiffs allege a violation of the FAPE requirement contained in the United States Department of Education's § 504 regulations, and the Americans With Disabilities Act.  (Compl. at 6, Doc. 1.)

Similar to the IDEA, the Rehabilitation Act requires a school district to provide a free appropriate education.  34 C.F.R. § 104.33(a)-(b).  The ADA adopts the Rehabilitation Act's program accessibility requirements.  28 C.F.R. § 35.103(a).

The relationship between a claim of violation of the FAPE requirements contained in United States DOE's § 504 regulations, and the provision of a FAPE under the IDEA, was recently reviewed by the Ninth Circuit Court in the case of Mark H. v. Lemahieu, 513 F.3d 922 (9th Cir. 2008).  The Ninth Circuit Court reiterated in Mark H., that the United States DOE's § 504 regulations state

that adopting a valid IDEA IEP is sufficient to satisfy the § 504
FAPE requirements. <u>Id.</u> at 933. "'Implementation of an [IEP
under the IDEA] is one means of meeting' the substantive portion
of the § 504 regulations' definition of FAPE." <u>Id.</u> (<u>quoting</u> 34
C.F.R. § 104.33(b)(2)). "Compliance with the procedural
safeguards of section 615 of the [IDEA] is one means of meeting"
the § 504 procedural requirements in § 104.36. 34 C.F.R. §
104.36.

Here, because the May 9, July 12, and December 8, 2005, IEPs
provide Jordan with a FAPE under the IDEA, the FAPE requirements
contained in the United States DOE's § 504 regulations, and in
the ADA, are satisfied and Plaintiffs' § 504 and ADA claims fail.
34 C.F.R. § 104.33(b)(2); <u>Pasatiempo v. Aizawa</u>, 103 F.3d 796, 798
(9th Cir. 1996) ("The regulations further provide that compliance
with the IDEA's procedures satisfies the requirements of §
504."). The DOE complied with the procedural and substantive
requirements of the IDEA, of § 504, and of the ADA.

<u>CONCLUSION</u>

For the foregoing reasons:

1.    The July 20, 2007 Findings of Fact, Conclusions Of Law
And Decision of the Administrative Hearings Officer is AFFIRMED
IN PART AND DENIED IN PART.

2.    Plaintiffs' are entitled to reimbursement for
reasonable counseling services that Plaintiffs privately funded

43

during the time period from December 17, 2005 through January 6, 2006 when the DOE did not provide the mental health services set out in the December 8, 2005 IEP.

       3.    Plaintiffs' request for attorneys' fees and costs is DENIED.

       4.    The Court REFERS the matter to Magistrate Judge Leslie E. Kobayashi to act as Special Master for a determination of reasonable reimbursement for the costs of the mental health services.

       IT IS SO ORDERED.

       DATED: December 19, 2008, Honolulu, Hawaii.



                         **/s/ Helen Gillmor**
                         Chief United States District Judge

ROBERT M. and DEBORAH M., on behalf of themselves and their minor child, JORDAN M. v. STATE OF HAWAII, Civ. No. 07-00432 HG-LEK; ORDER AFFIRMING IN PART AND DENYING IN PART THE JULY 2O, 2007 FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION OF THE ADMINISTRATIVE HEARINGS OFFICER